IN THE UNITED STATES DISTRICT COURT
FOR THE CENTRAL DISTRICT OF ILLINOIS
SPRINGFIELD DIVISION

ESTATE OF HAROLD STULLER,    )
deceased, WILMA STULLER, named  )
executor, WILMA STULLER and    )
L.S.A., INC.,    )
    )
    Plaintiffs,    )
    )
    v.    )    NO. 11-3080
    )
UNITED STATES OF AMERICA and  )
its Agency, Secretary, Treasury    )
Department, Internal Revenue    )
Service,    )
    )
    Defendants.    )

## OPINION

RICHARD MILLS, U.S. District Judge:

Bench trial.

The Plaintiffs are the Estate of Harold Stuller, Wilma Stuller, as executor of Harold Stuller's Estate and individually, and L.S.A., Inc.  The Defendant is the United State of America.

The Plaintiffs filed this action for refund of federal income taxes, penalties and interest paid with respect to the taxable years 2003, 2004 and

2005.  The Court retains jurisdiction over the subject matter pursuant to 28 U.S.C. § 1346(a)(1) and 26 U.S.C. § 7422.  Venue is proper under 28 U.S.C. § 1391.

At the conclusion of their case, the Plaintiffs filed a Motion to Shift Burden of Proof pursuant to 26 U.S.C. § 7491.  The statute provides that upon a showing of credible evidence on a factual issue pertaining to liability, the burden then shifts to the Defendant.  See 26 U.S.C. § 7491(a)(1).  The Court Allowed the Plaintiffs' Motion.  The Defendant claims the granting of the motion was premature because the Court had not yet ruled on certain evidentiary objections.  However, this shifting of the burden of proof is significant only if there is an evidentiary tie.  See Keating v. Commissioner, 544 F.3d 900, 906 (8th Cir. 2008)

Upon reviewing the record, including the transcripts, exhibits and Parties' briefs, the Court makes the following findings of fact and conclusions of law.

BACKGROUND

A. Procedural History and Jurisdictional Facts

Harold Stuller and Wilma Stuller ("the Stullers") filed their income tax returns for the tax years 2003, 2004, and 2005 on February 20, 2005, August 18, 2005, and October 16, 2006, respectively, and paid the full amount of tax due as reported by them at the time the returns were filed.[1]

The Stullers are the owners of the L.S.A., Inc., a/k/a L.S.A. Farms, Inc. a/k/a "Rockin S Ranch" ("LSA").  They elected for LSA to be treated as an S Corporation for purposes of the Internal Revenue Code.  This means that any gains or losses for the entity LSA "pass through" to the Stullers, and the Stullers report such gain or losses on their personal income tax returns.

During 2007, the Internal Revenue Service ("IRS") selected the Stullers' 2003, 2004 and 2005 income tax returns (Forms 1040) for examination.  On June 2, 2009, the IRS issued Notices of Deficiency to the

[1]The Stullers filed a joint return for 2003.  On January 8, 2003, Harold Stuller died.  In 2004 and 2005, Wilma Stuller filed an individual return.  At times, the Court will refer to the Stullers collectively without regard to that distinction or to Ms. Stuller individually for events that occurred after Mr. Stuller's death.

Stullers for the taxable years 2003, 2004 and 2005. On November 23, 2009, the IRS assessed additional tax, penalties, and interest as shown below in accordance with its Notices of Deficiency: (1) in 2003, additional tax of $47,222.00, late filing penalty of $10,624.95, late payment penalty of $16,454.69, interest of $22,817.84; (2) in 2004, additional tax of $50,862.00, interest of $13,305.77; and (3) in 2005, additional tax of $52,008.00, interest of $12,461.14. On August 27, 2009, Ms. Stuller fully paid the assessments indicated above, in the total amount of $225,756.39.

On or before July 19, 2010, the Stullers filed claims for refund for the taxable years 2003, 2004 and 2005. After the IRS did not respond to the claims for refund within six months, the Plaintiffs filed this action on March 23, 2011, seeking a refund of the additional amounts paid as noted above. Defendant United States of America disputes that Plaintiffs are entitled to the amounts, except for the late penalty assessed against them in the amount of $16,454.69 for the tax year 2003. The Defendant acknowledges that pursuant to 26 U.S.C. § 6651(a)(2), the Plaintiffs are entitled to that amount plus statutory interest.

## B. The Springfield Property and 2003 Fire

The Stullers lived at 5595 Old Salem Road, Springfield, IL ("the Springfield Property") until a fire occurred there on January 6, 2003. Mr. Stuller died on January 8, 2003, as a result of the fire.[2]

The January 2003 fire destroyed most of the Springfield Property and made it uninhabitable. Immediately after the fire, surviving records and personal items that were stored at the home before the fire were moved to Evans Disaster Restoration Facility.

As a result of the fire and smoke inhalation, Wilma Stuller developed double pneumonia. She was hospitalized on January 15, 2003, and she remained in the hospital for several weeks. Following her release from the hospital, Ms. Stuller rented and temporarily relocated to an apartment for the period February 1, 2003 through January 31, 2004. After the lease expired, Ms. Stuller relocated to one of her rental properties.

---

[2]In 2012, Ms. Stuller married Mack Motes. Mr. Motes was the trainer for the Stullers' horse-breeding farm. Throughout this Order, the Court generally refers to Plaintiff Wilma Stuller-Motes as "Ms. Stuller" because many of the events relevant to this action occurred when she was married to Harold Stuller and/or before she married Mr. Motes.

Because of the fire, the Springfield Property required extensive renovations. Ms. Stuller and her personal assistant, Denise Sherwood, managed the renovations which began in February of 2003.

### C. Background and Purchase of the Cheatham Property

The Stullers were married in 1964. At that time, Mr. Stuller had a Tennessee Walking Horse. His family also owned a Steak 'n Shake franchise, which Ms. Stuller began helping out with after the marriage. At the time of Mr. Stuller's death, the Steak 'n Shake business included five franchises, which were operated under the name of Stuller, Inc. Ms. Stuller was very involved with the business and considered herself a partner therein. After Mr. Stuller's death, she became President of the corporation.

Wilma Stuller testified she also started breeding Tennessee Walking Horses in the 1970s. Although the operation was not then set up as a business, Ms. Stuller stated she decided in the early or mid-1980s to start breeding the horses for profit. After three or four mares aborted colts due to a harsh winter in the late 1970s, Ms. Stuller decided to begin boarding her horses in Tennessee.

It was in 1992 that Ms. Stuller formed LSA for her horse-breeding operation. In 1995, Ms. Stuller sold her first farm property and the Stullers purchased a house located at 1489 Cheatham Springs Road, Eagleville, TN 37060 for $265,000.00. At the same time, the Stullers purchased the adjoining 224 acres for a total of $336,000.00, which was $1,500.00 per acre (collectively, the house and adjoining land is referred to as the "Cheatham Property").

In approximately 1997, the Stullers purchased a parcel of 7 acres which adjoined the Tennessee property for $10,000.00. In 1999, another adjoining parcel of 61 acres was purchased by the Stullers at an auction for a total of $191,548.00.

The collective purchase price of all of the Cheatham Property, including the house and adjoining land consisting of about 332 acres, was $802,548. At all times, the Cheatham Property was owned by the Stullers individually or by them as trustees of two family revocable trusts, one in each of their names.

D. Expert Testimony and Evidentiary Ruling

In a previous Order, upon finding that Mack Motes did not consider any of the relevant factors set forth in 26 C.F.R. § 1.183-2(b), the Court excluded any expert opinion testimony from Mr. Motes regarding whether the horse-breeding operation was carried on with the intent to earn a profit.

The Defendant's expert, Wayne Hipsley, holds a bachelor of science degree in agriculture with an emphasis on animal husbandry and a master of science degree in animal physiology with an emphasis in equine reproduction. Mr. Hipsley testified he has taught college-level courses on horse-related topics. Moreover, he has been involved in a number of certificate type programs on horse-related products.

Mr. Hipsley testified that he has worked on horse farms in different capacities. He has also been in charge of managing herds of horses at the universities where he has worked. He has provided consulting services for multiple horse farms, assessing probability and recommending changes to increase profits. Mr. Hipsley has been involved with breed associations and had executive positions with various breed associations. He has also served as a judge for various horse shows and been involved with the United States

Equestrian Foundation.

Mr. Hipsley testified he has been retained to consult in approximately fifty cases in which horse-related issues were involved. In connection therewith, he has written roughly twenty expert reports and testified at trial as an expert on four occasions.

In relation to this case, Mr. Hipsley reviewed thousands of pages of documents and listened to the deposition and trial testimony. He submitted a report that focused on the nine factors set forth in 26 C.F.R. § 1.183-2(b). Upon considering each factor collectively, Mr. Hipsley was of the opinion LSA was not managed and operated as a for-profit business in 2003, 2004 and 2005.

Applicable Statutes, Section 183 factors and Other Considerations

The relevant statute provides, "There shall be allowed as a deduction all the ordinary and necessary expenses paid or incurred during the taxable year in carrying on any trade or business." 26 U.S.C. § 162(a). "In the case of an individual, there shall be allowed as a deduction all the ordinary and necessary expenses paid or incurred during the taxable year." 26

U.S.C. § 212.

The activity must be engaged in for profit. "In the case of an activity engaged in by an individual or an S corporation, if such activity is not engaged in for profit, no deduction attributable to such activity shall be allowed under this chapter except as provided in this section." 26 U.S.C. § 183(a).

The regulation provides in relevant part:

> The determination whether an activity is engaged in for profit is to be made by reference to objective standards, taking into account all of the facts and circumstances of each case. Although a reasonable expectation of profit is not required, the facts and circumstances must indicate that the taxpayer entered into the activity, or continued the activity, with the objective of making a profit. In determining whether such an objective exists, it may be sufficient that there is a small chance of making a large profit. Thus it may be found that an investor in a wildcat oil well who incurs very substantial expenditures is in the venture for profit even though the expectation of a profit might be considered unreasonable. In determining whether an activity is engaged in for profit, greater weight is given to objective facts than to the taxpayer's mere statement of his intent.

26 C.F.R. § 1.183-2(a).

I. Manner in which the taxpayers carried on the activity

(1)

Section 183 is an effort by Congress to "create an objective standard to determine whether a taxpayer was carrying on a business for the purpose of realizing a profit or was instead merely attempting to create and utilize losses to offset other income."  See Nickerson v. Commissioner, 700 F.2d 402, 405 (7th Cir. 1983) (citation omitted).  The first factor is the manner in which the taxpayer carries on the activity.  The regulation provides:

> The fact that the taxpayer carries on the activity in a businesslike manner and maintains complete and accurate books and records may indicate that the activity is engaged in for profit.  Similarly, where an activity is carried on in a manner substantially similar to other activities of the same nature which are profitable, a profit motive may be indicated.  A change of operating methods, adoption of new techniques or abandonment of unprofitable methods in a manner consistent with an intent to improve profitability may also indicate a profit motive.

See C.F.R. § 1.183-2(b)(1).  The parties dispute whether the Plaintiffs' horse-breeding activities were carried on in a business-like manner.

Ms. Stuller maintained a separate bank account for her horse operation and received monthly statements.  Financial statements were produced through a Quickbooks Register.  Moreover, financial statements

11

were produced annually, based on the monthly bank statements and summary handwritten documents kept by Ms. Stuller. She testified that she monitored all expenses for the business by maintaining and monitoring the checkbook. Ms. Stuller was the only person who wrote checks for the operation. The Plaintiffs state these activities allowed them to assess the horse-breeding activity's economic performance and identify cost-reducing strategies. Mario Perrino, CPA, testified it was not unusual for agricultural businesses of this type to maintain books and records in this fashion. Additionally Todd Howe, branch manager for the Rochester Bank and Trust, testified that he regularly works with many agricultural customers in this area, and that Plaintiffs' method of record keeping was typical for this type of business.

The Defendant notes that few records were maintained. Excluding some receipts which were filed by Denise Sherwood in a box, the only records that were maintained were checkbooks and check registers, notes on a calendar and, according to Ms. Stuller's testimony, her stallion reports and registration certificates. Ms. Stuller testified she did not retain the

calendars from year to year and did not keep records regarding training or prizes won by the horses. Expenses such as advertising, automobile and truck expenses, commissions, dues and subscriptions, utilities professional fees, labor, and telephone charges, did not appear as regular expenses in LSA's financial statements or tax returns.

The Defendant claims LSA's record-keeping practices were improper. Although LSA had its own checking account, Ms. Stuller sometimes paid expenses for LSA from her personal checking account. The compensation arrangement for Mr. Motes was based on a handshake agreement and involved various types of in-kind compensation instead of a fixed salary. Mr. Hipsley testified that having a written agreement is important in operating a farm business in that it protects the legal interests of both parties.

LSA did not have a written business plan for the tax years at issue. Mr. Perrino testified LSA had a business plan, but not a written one. LSA had no budget, did not calculate expenses on a per-horse basis, and did not implement an advanced financial system. The Stullers did not properly

keep track of the sales of horses. Thus, it is not apparent whether the Plaintiffs possessed any records that would have allowed them to evaluate the financial results of LSA to effectively cut expenses or assess its performance, such as when and how many of its horses were purchased, how much each horse cost, when they were sold and the sale price of each horse. Ms. Stuller testified one purpose of keeping records was she would know when to put more money in the business account.

Mr. Hipsley testified that proper accounting is important to determining actual cost, which is an important aspect for establishing an annual budget. Moreover, it is difficult to make adjustments to a business without having a budget to work from. Based on his review of the documents produced by the Plaintiffs, Mr. Hipsley did not find any evidence of an invoicing system. Moreover, Mr. Perrino testified that based on the documents he reviewed, it was unclear whether the income from LSA's sale of a horse was from before or after Mr. Motes received his share of profits from the horse.

Mr. Hipsley also testified that keeping proper track of sales is

important to determining whether business goals are reached in a given year. He further stated that cost-center analysis, or keeping track of which horses are profitable and what prices horses are being sold for, is important to business. While Mr. Perrino advised the Stullers what types of records to maintain, he acknowledged the types of records sufficient for tax purposes are not necessarily enough for other business purposes.

The Plaintiffs acknowledge they could have computerized records, prepared business models, spent more money on administration, etc. However, they claim these actions were not necessary and would have served only to increase costs, not profits. Ms. Stuller attempted to computerize records but encountered significant problems, forcing her to return to paper records. The Defendant claims the failure of Ms. Stuller to make such changes when she was losing tens of thousands of dollars a year is evidence that she did not have the primary purpose of making a profit, particularly when she had knowledge of how to make a profit with her Steak 'n Shake franchises. The Plaintiffs respond by noting those businesses were subject to corporate requirements pertaining to financial

reporting and record-keeping.

(2)

The parties also dispute the sufficiency of the Plaintiffs' marketing efforts. Their major source of marketing was attendance at horse shows. Ms. Stuller attended and/or competed in horse shows on almost a weekly basis. However, the record shows there were a number of years that LSA and the Stullers did not enter any horses in Celebration, the primary show of the year, or the horses were entered but did not show.[3]

The Stullers regularly entered in horse shows four stallions and two mares, none of which were used for breeding purposes for LSA, and one gelding. One of the mares, Trigger's Fancy Lady, was owned by Ms. Stuller personally and not LSA. The evidence showed that instead of new horses, some of the same horses were shown again and again. Mr. Hipsley testified this practice did nothing to serve LSA and might suggest the horses were being shown for Ms. Stuller's personal pleasure. The practice of showing

_____

[3]There were no horses showed in 2000, 2002, 2005, 2008, 2009 and 2010. One horse showed in 2001. Three horses showed in 2003 and 2007, and five horses showed in 2004.

the same horses might suggest that all of the horses were not always for sale and that she had become attached to the horses and enjoyed showing them.

For example, LSA purchased Solid Gold Decision for $20,000 in 2003, which was half-owned by Mr. Motes at the time. The horse was entered in shows repeatedly in 2003, 2004, 2006 and 2007, with LSA paying for him to be trained. LSA also purchased Strictly Cash for $15,000 in 1999. Strictly Cash was entered in shows repeatedly–including at least six years in Celebration–with LSA paying for him to be trained. LSA purchased Quarterback's Rising Star from Mr. Motes in 1995. Quarterback's Rising Star was entered in shows repeatedly–including at least seven years in Celebration–with LSA paying for him to be trained during that time. None of these horses were used for breeding and none were sold.

A horse's value tends to increase if it places well at Celebration. Mr. Hipsley testified that LSA did not produce horses of the quality to be competitive in Celebration. The show results do not indicate that any of its horses placed above sixth place in Celebration. Because of the rule that

a horse show judge may not judge horses that he or she trains, LSA could not show horses at shows that Mr. Motes judged. As a result, LSA's horses could not compete in Celebration in 2002.

(3)

The Plaintiffs stated they took certain measures in attempting to become profitable: doing their own labor and not hiring outside help other than Mr. Motes. However, these efforts made little difference in reducing expenses. Mr. Hipsley testified the problem was that the Stullers' horse breeding operation did not generate enough revenue to offset LSA's losses. In 2003, LSA registered nineteen horses and sold three. In 2004, it registered nineteen horses and sold five. In 2005, LSA registered sixteen horses and sold five.

Mr. Hipsley testified there is more potential to make money by selling a horse when it is younger because fewer expenses have been incurred. Moreover, horses generally only appreciate in value up to a certain age. Although a horse's value can be enhanced by training, many of LSA's horses were not put in training. Accordingly, Mr. Hipsley testified the Stullers did

not take adequate steps to ensure their horses would increase in value.

Mr. Hipsley also testified it is important to regularly assess the value of each of the horses in a herd to determine an appropriate price. Although the price of a horse can be hard to determine, there is some evidence that the Stullers did not always make reasonable estimates of the horse's value. Moreover, Mr. Motes had a one-half interest in any horse born on the LSA farm. To make a profit, therefore, LSA was required to generate enough revenue from a sale of a horse in order to cover its expenses from only half of the sale price of the horse.

Although LSA continued to lose tens of thousands of dollars annually, the Plaintiffs did not identify any significant changes to its method of operating in order to generate additional revenue. Mr. Hipsley testified regarding the concept of a diversified horse farm business model, under which if a farm is exclusively breeding horses and its cash flow is insufficient, it would search for other sources of income. No evidence was presented regarding the diversification of operations at any time during the tax years at issue. The Stullers engaged in certain practices which would

appear to be inconsistent with an intent to make a profit. They traded horses with Mr. Motes and his daughter. Mr. Hipsley testified that bartering without clear knowledge of the value of the horse is a poor business practice. In addition, LSA gave away horses even though those horses could have been sold to a prospective buyer. Additionally, Mr. Hipsley noted that the Stullers were purchasing additional horses for LSA even though LSA was consistently losing money.

As part of his compensation arrangement with the Stullers, Mr. Motes was permitted to breed his mares with the Stullers' stallions. A colt produced by one of those mares would produce a horse with similar genetic qualities to those of the type the Stullers had for sale. If Mr. Motes were to offer such horses for sale, they would be in direct competition with the horses the Stullers were attempting to sell. No evidence was presented that LSA abandoned these poor business practices.

The Plaintiffs state they also marketed the operation through advertisements in horse show programs, which was free. Moreover, because of Ms. Stuller's and Mr. Motes's stellar reputation in the horse-breeding

community, the Plaintiffs suggest significant advertising was not necessary. From 1999 to 2005, LSA spent only $50 on marketing. It did not put out press releases, send newsletters to clients, or have a farm logo. It was not until 2007 or 2008 that Denise Sherwood created a website for the LSA farm. When the website was created, although the corporation was called LSA and the horses were generally shown under that name, the name "Rockin-S Ranch" was chosen for the website. Mr. Hipsley testified regarding certain measures he believed might make LSA more profitable, including business cards, stationary, brochures and advertising in print or electronic media. Because there are approximately 100 or so horse farms in the general vicinity of the Cheatham Property, certain advertising measures possibly could have been used to distinguish LSA from other entities.

The Plaintiffs take issue with Mr. Hipsley's analysis. Mr. Hipsley did not testify that his concept of "best management practices" was generally accepted in the horse breeding industry. Moreover, he admitted it was possible for a horse breeding operation to be profitable without

implementing these practices. Mr. Hipsley never visited the Cheatham Property. He acknowledged that although his expert report discussed a number of "best management practices," all that is really needed is a budget and a marketing plan to demonstrate an intent to make a profit. The documents need not even be written. Additionally, Mr. Hipsley did not review the financial statements of LSA prior to rendering an opinion on the Plaintiffs' "records and recordkeeping" practices. The report contained inaccuracies as to certain LSA expenses.

(4)

The evidence showed Ms. Stuller believed there were certain measures she could take to operate LSA in a more business-like manner. The record shows she had an unwritten business plan which provided that, among other things, she track her business expenses on a monthly basis and create profit and loss reports, establish a budget and implement a more advanced financial system for the farm. However, Ms. Stuller testified she did not establish a budget, implement a more advanced financial system, provide data to her accountant on a monthly basis or make monthly profit and loss

sheets during the years in question.

Ms. Stuller testified LSA's business plan was "[t]o raise the best horses we could at the least cost. To cut our expenses as much as we could by doing most of it ourselves." LSA's largest expense for the tax years at issue was the cost associated with training the horses. Mr. Motes was paid for his services as follows: (1) $39,828.40 in 2003; (2) $33,313.80 in 2004; and (3) $29,452.20 in 2005. These amounts covered the four to six horses that Mr. Motes trained for LSA, in addition to fees paid to him to shoe LSA horses. They do not include the amount Mr. Motes earned from sales of the colts born to LSA's horses, which was considered his salary for the work he performed as farm manager and for which he received a commission. The Stullers never attempted to renegotiate their agreement with Mr. Motes in order to decrease expenses.

Although LSA was losing tens of thousands annually, Mr. Motes was profiting extensively. In addition to his regular payment for training, Mr. Motes got a half-interest in all the colts born on the farm and thus could keep half of any sale proceeds without incurring any expenses except for his

time.  Mr. Motes could also keep breeding his own horses on the side, including breeding his horses to LSA's horses for free, and training horses for other clients.  Ms. Stuller testified Mr. Motes traded and bought and sold horses between himself and LSA.

During the time she has owned LSA, Ms. Stuller has always had personal "hobby" horses whose expenses she did not deduct on her tax return.  There is no evidence these horses were managed any differently from the horses that Plaintiffs claim were owned by LSA.  Moreover, Ms. Stuller testified that like those horses, her "hobby" horses were always for sale and she rode them at trail rides as a way to market them.  She also showed them, bred them and bought and sold them.

(5)

In considering the objective facts, the first factor favors the Defendant.  Of course, the Court recognizes that an entity such as LSA need not follow all of the corporate formalities that Ms. Stuller was required to adhere to operating her Steak 'n Shake franchises.  It is not at all uncommon for an agriculture business to maintain records in a more

informal manner.

Although a taxpayer need not have a sophisticated accounting system, he or she should use a system that assists the individual in making informed business decisions. See Burger v. Commissioner, 809 F.2d 355, 359 (7th Cir. 1987). However, the record shows that LSA kept minimal records and did not have a written agreement with its primary employee, Mr. Motes. It appears the records that were kept were done so primarily for tax purposes and not to evaluate the company's financial status. The business records factor generally contemplates employing a system of determining profitability and analyzing expenses, not simply to record transactions for tax reporting purposes. See Keating v. Commissioner, TCM 2007-309, at *5 (2007). In Burger, the court observed that a bookkeeping system which did not allow the taxpayers to monitor losses or expenses was significant to the court's conclusion that a dog-breeding business was a hobby. See Burger, 809 F.2d at 359. Thus, an most important consideration is to implement measures control expenses and to limit losses. See id.

Despite consistent annual losses, LSA did not alter its operating methods or adopt any new techniques of note in attempting to establish a profitable operation. This is true despite the fact that Ms. Stuller identified certain measures that might be helpful. This contrasts with the manner in which Ms. Stuller operated Steak 'n Shake. Ms. Stuller testified that when that business was not performing well, she took certain actions in the hope of turning it around. Although such actions may have been required by corporate policy, it is only logical to alter operating methods or adopt new techniques if the current methods are resulting in substantial losses.

The fact that LSA's practices appeared to be identical to those of Ms. Stuller's "hobby" horses also weighs in favor of the Defendant. The applicable regulation provides in part, "[W]here an activity is carried on in a manner substantially similar to other activities of the same nature which are profitable, a profit motive may be indicated." See 26 C.F.R. § 1.183-2(b)(1). It would seem to follow that if an activity is carried on in a manner substantially similar to a hobby, then a profit motive would not be indicated. Accordingly, the fact that the Stullers carried on these activities

in a similar manner supports the Defendant's argument that LSA was not engaged in the activity for profit. Therefore, the first factor favors the Defendant.

## II. Expertise of the taxpayers or their advisors

(1)

The second factor is the expertise of the taxpayers or their advisors. The applicable part of the regulation provides:

> Preparation for the activity by extensive study of its accepted business, economic, and scientific practices, or consultation with those who are expert therein, may indicate that the taxpayer has a profit motive where the taxpayer carries on the activity in accordance with such practices. Where a taxpayer has such preparation or procures such expert advice, but does not carry on the activity in accordance with such practices, a lack of intent to derive profit may be indicated unless it appears that the taxpayer is attempting to develop new or superior techniques which may result in profits from the activity.

26 C.F.R. § 1.183-2(b)(2). The Plaintiffs allege this factor favors their argument that the Stullers intended to derive a profit for the horse operation. The Defendant's expert, Wayne Hipsley, conceded in his report that the combined experience of the Harold and Wilma Stuller, the

employment of Mack Motes and the retention of Mario Perrino, a professional financial consultant, demonstrated that the Plaintiffs satisfied this factor, which the Plaintiffs claim evinces an intent to derive a profit for their horse operation.

Ms. Stuller testified that although the Stullers bred and sold horses prior to the founding of LSA in 1992, she did not know if those efforts were profitable. Although the Stullers may have had extensive knowledge about horses generally and horse breeding in particular, there is no evidence that the Stullers consulted with anyone who was an expert in the financial aspects of such operations. Mr. Motes does not have an expertise in that arena. He testified he does not handle the finances or prepare the tax returns for his business. Moreover, Mr. Motes was not involved with the finances of LSA and he acquired much of his knowledge pertaining to its financial status during the bench trial. Therefore, Mr. Motes did not provide expert advice to the Stullers on how to make a profit.

Although the Plaintiffs used a professional accountant for tax preparation, there is no evidence Mr. Perrino was competent to advise the

Stullers how to make a profit in a horse-breeding enterprise. Mr. Perrino occasionally provided "informal" business advice to the Stullers, for which he did not charge. He has no specific experience in breeding horses or in the horse industry. Mr. Perrino was unable to provide advice as to how to reduce expenses, such as for boarding and training or feed and grain costs. Mr. Perrino testified Ms. Stuller never asked him to draft a written business plan or per horse cost estimate or a return on investment analysis, either of which he was capable of doing.

According to the testimony at trial, Ms. Stuller did not seek any informal advice from friends or acquaintances who might have had some knowledge about horse breeding. Ms. Stuller and Hartzel Bruno, a long-time friend of the Stullers, discussed their respective livestock, though they never discussed earning a profit through a horse-breeding operation.[4] Ms. Stuller did not ask Denise Sherwood about running such a business, even though Ms. Sherwood also owned horses and has a degree in equine management.

_____

[4]In 2003, Ms. Stuller hired Mr. Bruno as Steak 'n Shake's Director of Operations.

(2)

If a taxpayer lacks an expertise on how to make an operation profitable, the failure to consult an expert or experts on the business aspects or to develop their own economic expertise is a factor that suggests a lack of a profit motive. See Burger, 809 F.2d at 359.

The Court concludes that the second factor favors the Defendant. Although the Stullers had significant business experience and an obvious profit motive at Steak 'n Shake, the nature of the horse breeding business is entirely different. Despite consistent losses, Ms. Stuller did not consult with any experts regarding business practices that might result in profits. Ms. Stuller testified that she did not talk to other horse owners about how to make a profit in horse breeding. Mr. Perrino is an accountant who testified he was not capable of providing advice specific to the horse-breeding industry. Although Mr. Motes has extensive knowledge and experience regarding horse breeding in general, he has no expertise in the financial or business aspects of a horse-breeding operation. There is no evidence that the Stullers were attempting to develop new and superior

techniques that could result in profits.

Accordingly, because the Plaintiffs did not seek out experts in the financial aspects of horse breeding, the second factor slightly favors the Defendant.

### III. Time and effort expended by taxpayer in carrying on activity

The third factor is the time and effort expended by the taxpayer in carrying on the activity.  The regulation provides:

> The fact that the taxpayer devotes much of his personal time and effort in carrying on an activity, particularly if the activity does not have substantial personal or recreational aspects, may indicate an intention to derive a profit.  A taxpayer's withdrawal from another occupation to devote most of his energies to the activity may also be evidence that the activity is engaged in for profit.  The fact that the taxpayer devotes a limited amount of time to an activity does not necessarily indicate a lack of profit motive where the taxpayer employs competent and qualified persons to carry on such activity.

26 C.F.R. § 1.183-2(b)(3).  There is no question that the Stullers devoted considerable time and effort in operating LSA.  Mr. Hipsley's expert report states that based on her deposition testimony, "it would appear Ms. Stuller-Motes was engaged in on-farm activities to support the business during FY

2003, 2004 and 2005." According to the testimony at trial, however, these efforts resulted in significant personal enjoyment and were a source of recreation and a social outlet. Ms. Stuller testified she attended horse shows even when her horses were not showing. Moreover, she has many friends who enjoy horses. Ms. Stuller continued to pursue other business ventures, including Steak 'n Shake and a new restaurant, The Livery, which ultimately was not successful.

The Court concludes this factor does not strongly favor either party. Ms. Stuller did not withdraw from her primary occupation and continued to pursue other business opportunities. The considerable amount of time that the Stullers spent on LSA can be attributed, at least in significant part, to their personal enjoyment of the recreational aspects of owning and breeding horses. Therefore, the third factor appears to be neutral.

IV. Expectation that assets used in activity may appreciate in value

(1)

The fourth factor to consider is whether there is an expectation that

the assets used in the activity, specifically the Plaintiffs' land,[5] may

appreciate in value.  The regulation provides:

> The term profit encompasses appreciation in the value of
> assets, such as land, used in the activity.  Thus, the taxpayer
> may intend to derive a profit from the operation of the activity,
> and may also intend that, even if no profit from current
> operations is derived, an overall profit will result when
> appreciation in the value of the land will exceed expenses of the
> operation.   See, however, paragraph (d) of § 1.183-1 for
> definition of activity in this connection.

26 C.F.R. § 1.183-2(b)(4).  Section 1.183-1(d) states in pertinent part:

> If the taxpayer engages in two or more separate activities,
> deductions and income from each separate activity are not
> aggregated either in determining whether a particular activity is
> engaged in for profit or in applying section 183.  Where land is
> purchased or held primarily with the intent to profit from
> increase in its value, and the taxpayer also engaged in farming
> on such land, the farming and the holding of the land will
> ordinarily be considered a single activity only if the farming
> activity reduces the net cost of carrying the land for its
> appreciation in value.  Thus, the farming and holding of the
> land will be considered a single activity only if the income
> derived from farming exceeds the deductions attributable to the
> farming activity which are not directly attributable to the

---

[5]The Defendant filed a pre-trial motion in limine seeking the exclusion of any evidence regarding the Plaintiffs' expectation that the Cheatham Property would increase in value.  Because this case was not tried before a jury and based on certain factual disputes between the parties, the Court denied the motion and stated it would consider the issue after hearing all the evidence.

holding of land (that is, deductions other than those directly attributable to the holding of the land such as interest on a mortgage secured by the land, annual property taxes attributable to the land and improvements, and depreciation of improvements to the land).

26 C.F.R. § 1.183-1(d).

The Plaintiffs claim an expectation that land used in the activity will appreciate and return an overall profit in the activity indicates a profit objective. Generally, the Commissioner will accept the characterization by the Taxpayer of several undertakings either as a single activity or as separate activities, unless it appears that the characterization is artificial and unsupported by the facts. See Mullins v. Tennessee, 334 F. Supp.2d 1042, 1054 (E.D. Tenn. 2004), citing 26 C.F.R. § 1.183-1(d). Ms. Stuller testified that prior to the purchase of the Cheatham Property, the Stullers purchased and owned another property in Petersburg, Tennessee. This property was acquired in 1985 and sold in 1995, which resulted in a nice profit.

At all times, the Cheatham Property was owned by the Stullers individually or by them as trustees of two family revocable trusts, one in

each of their names. The trusts were for the benefit of the Stullers' granddaughter. Ms. Stuller testified she also thought she would profit from the sale of the Cheatham Property due to its location near Nashville. Although she considers it a second home and continues to live there, Ms. Stuller stated they would not have purchased the home if they did not intend to use it as a horse farm. Ms. Stuller has not put up the property for sale, though she testified that she eventually plans to sell it.

During the tax years at issue, LSA had its own separate bank account while expenses of the Cheatham Property were paid from the Stullers' individual accounts. Every year except two years from 1994 to 2009, the Stullers loaned LSA more money than the amount of rent LSA paid. LSA did not reduce carrying costs of the Cheatham Property. Rather, LSA continued to lose money almost every year from 1994 to 2009, even excluding expenses attributable to holding the land.

The Plaintiffs dispute the Defendants' argument that the horse operation lost large sums of money. Mr. Perrino testified that the $80,000 "loss" per year in rent for LSA's use of the farm property was actually listed

as income on the Plaintiffs' tax return. Thus, the Stullers' income offset LSA's "loss."

Mr. Perrino further testified that the inclusion of depreciation losses is misleading. He explained depreciation is not an actual loss incurred by the business, but rather a "paper loss" allowed by the Government for tax purposes. The effect is to allow a current deduction for an asset to be offset at the time of the asset's sale which, in most cases, results in no actual loss to the business.

When these amounts are deducted, the Plaintiffs claim the losses for the horse enterprise are not $134,918, $150,370 and $144,265 for the taxable years 2003, 2004 and 2005, respectively. According to Mr. Perrino, the actual losses to the Plaintiffs are $28,358.00, $51,262.00 and $38,971.00 for the same years, respectively, which averages out to approximately $34,000.00 per year.

The total cost for the Cheatham Property, including the additional real property purchased, was $802,548.00. The Plaintiffs received an appraisal dated June 6, 2008 from Todd Howe at the Rochester Bank and

Trust which determined that the fair market value of the Cheatham Property was $3.0 million. According to the Plaintiffs, this establishes that their expectation that the property would appreciate was reasonable. The resulting gain of more than $2.1 million would easily exceed the total expenses of the horse farm operation.

The Defendant claims there is no indication that the appreciation of the property was due to the horse-breeding activity. It could have been due to the location of the property, as Ms. Stuller testified.

Ms. Stuller refinanced the property to pay her personal taxes and for other purposes not related to the business of the horse farm, including investing the money into Steak 'n Shake.

LSA had no other assets that would increase in value sufficiently to offset the continuing losses of the operation. According to Mr. Hipsley, Tennessee Walking Horses generally have the capacity to appreciate for five to seven years. However, horses do not appreciate in value unless efforts are made to add value to them. Mr. Hipsley testified the Stullers were not making appropriate efforts to ensure their horses increased in value because

he did not see any evidence that they were put into a formal training program.

The Plaintiffs contend the Court should reject the Defendant's argument that where the land was purchased for both appreciation and farming, these two purposes constitute a single activity under § 1.183-1(d)(1) only if the farm operations are profitable. If a taxpayer purchases land with the primary intent of profiting from a farming operation, it is irrelevant whether that operation produced sufficient income to reduce the net cost of holding the land. See Mullins, 334 F. Supp.2d at 1055.

In this case, the Plaintiffs allege the Cheatham Property was purchased only for the horse breeding operation. There were no "primary" and "other" purposes associated with the property. The only activity was horse breeding which, the Plaintiffs allege, maintained the property and led to its appreciation. It is reasonable to believe the property increased in value in large part because of its use as a horse farm and because it was well maintained for that purpose.

The Plaintiffs titled the farm real property in their names in 1995 and

their subsequent acquisitions occurring in 1996, 1999 and 2004 to their Revocable Trusts upon the advice of Mr. Perrino. Mr. Perrino advised the Plaintiffs that the ownership of the farm property by the individual Trusts would provide both asset protection and estate planning advantages. Because the individual taxpayers owned all of the assets of the horse breeding business, the use of different entities and trusts have no effect on the final analysis.

(2)

Certainly there is evidence, including Ms. Stuller's testimony, that the Cheatham Property appreciated for reasons other than horse-breeding activity. The Court will accept the Plaintiffs' characterization that the land was purchased for LSA's horse breeding operation. Like any landowner, the Stullers probably wanted the property to increase in value.

The Defendant states that if the Cheatham Property was held with any business purpose, it was held primarily to profit from its increase in value. Moreover, the Cheatham Property and LSA were two organizationally and economically distinct entities. The Stullers also used

the Cheatham Property for recreational and personal uses. The Defendant contends that because LSA had no other significant assets and it was not making appropriate efforts to add value to their horses, the fourth factor balances in its favor.

As noted, there are factual disputes regarding what extent, if any, the Cheatham Property's appreciation can be attributed to the horse breeding enterprise or whether it was due to other factors, such as location. There is a dispute about the extent of LSA's loss for the tax years in question. Despite this conflicting evidence, based on Ms. Stuller's explanation for why the Stullers purchased the Property, the Court finds that this factor weighs in the Plaintiff's favor.

## V. Success of taxpayer in carrying on other similar/dissimilar activities

### (1)

The fifth factor to consider is the success of the taxpayer in carrying on other similar or dissimilar activities. It provides as follows:

> The fact that the taxpayer has engaged in similar activities in the past and converted them from unprofitable to profitable enterprises may indicate that he is engaged in the present

activity for profit, even though the activity is presently
unprofitable.

26 C.F.R. § 1.183-2(b)(5).  The Plaintiffs claim this factor supports their

position.  As stated in Mr. Hipsley's expert report, they have demonstrated

financial success in the management and operation of other businesses, i.e.

Steak 'n Shake and commercial rental properties.

As provided in Mr. Hipsley's expert report, however, the

aforementioned profitable activities were considerably different from

breeding horses.  Moreover, the Steak 'n Shake businesses were franchises

and the Stullers had fewer responsibilities than at LSA, where they had to

operate all aspects of the enterprise.

Another restaurant business operated by Ms. Stuller was The Livery

in Downtown Springfield, Illinois.  That business was shut down after

losing hundreds of thousands of dollars in less than one year.

In operating Steak 'n Shake, the Stullers reviewed monthly financial

statements with their accountants.  They obtained various data from

corporate Steak 'n Shake in order to evaluate their restaurant's

performance.  At their Steak 'n Shake franchises, the Stullers used methods

such as suggestive selling and upselling to lead to more profitability.  They made changes when necessary, including moving a restaurant location.

(2)

Although the fifth factor does not strongly support either side, the Court concludes it slightly favors the Defendant.

While the Stullers were successful in operating Steak 'n Shake franchises and in renting commercial properties, the Plaintiffs do not address how those activities were similar to a horse-breeding operation.  It would appear those activities were significantly different from their horse-breeding operations.  The Stullers' successful ventures did not involve breeding or managing livestock.  Because the Steak 'n Shake restaurants were franchises, moreover, the Stullers had access to information from the corporate office, some of which was used in selling items.  Such information was also used to help the Stullers evaluate their restaurants' performance. They made changes to their franchises when necessary.

Due to the corporate direction, the Stullers had fewer responsibilities at Steak 'n Shake than they did at LSA, where they were responsible for the

entire operation.  Despite losing money at LSA, the Stullers made few changes to their operation.  The enterprises were not similarly structured. Because of the dissimilar nature of the operations, the Court is unable to conclude that the success of Steak 'n Shake is particularly probative of a profit motive with LSA.

The Court concludes that The Livery was a more similar operation to LSA.  The Livery was an independent business over which Ms. Stuller had complete control.  Therefore, it was structured more similarly to the horse-breeding operation than the other business ventures.  The Livery was not profitable and closed within a year of opening.

There is no evidence that the Stullers engaged in similar activities in the past and converted them from unprofitable to profitable enterprises. Accordingly, the Court finds that the fifth factor favors the Defendant.

<u>VI. Taxpayer's history of income or losses with respect to activity</u>

(1)

The sixth factor is the taxpayer's history of income or losses with respect to the activity.  The regulation provides:

A series of losses during the initial or start-up stage of an activity may not necessarily be an indication that the activity is not engaged in for profit. However, where losses continue to be sustained beyond the period which customarily is necessary to bring the operation to profitable status such continued losses, if not explainable, as to due to customary business risks or reverses, may be indicative that the activity is not being engaged in for profit. If losses are sustained because of unforeseen or fortuitous circumstances which are beyond the control of the taxpayer, such as drought, disease, fire, theft, weather damages, other involuntary conversions, or depressed market conditions, such losses would not be an indication that the activity is not engaged in for profit. A series of years in which net income was realized would of course be strong evidence that the activity is engaged in for profit.

26 C.F.R. § 1.183-2(b)(6). LSA was incorporated in 1992. Although LSA realized a profit in 1997, it reported losses every other year between 1994 and 2009. There is no evidence LSA made a profit in its first two years.

Despite spending a significant amount of time performing work for LSA, Ms. Stuller never received a salary. If she had received a salary, LSA would have incurred even greater losses.

By the end of 2003, the Stullers had already loaned LSA nearly $1.2 million which had not been repaid. By the end of 2005, they had made additional loans to LSA amounting to roughly $250,000.

44

LSA lost considerable amounts of money without a significant change in its financial status from one year to the next. It was not an example of what might be expected to occur with a start-up company–a situation where the operation was losing money but the amount of loss was declining significantly. Thus, it does not appear the losses can be explained as the losses attributed to the start-up of a company.

LSA did not pay interest on money that the Stullers loaned it in order to operate. If LSA had to pay interest on the loan, its losses would have been greater. Although Mario Perrino suggested these savings were not significant to LSA's financial status, there is no question LSA would have lost considerably more money if certain measures had not been taken.

Despite saving money in certain respects as noted above, the records show that LSA lost an average of approximately $100,000 per year from 1999 to 2005, when considering LSA's total income, its expenditures excluding rent and depreciation, and the mortgage interest and other interest, in addition to the property taxes paid by the Stullers.

The Defendant notes there is some evidence which suggests LSA's

actual losses were even greater than the listed amounts. The depreciation deduction was primarily due to expenses to purchase horses that could not be deducted over time due to restrictions in the Internal Revenue Code. Although the Stullers would pay income tax on the gain from the sale of a horse that had been depreciated (i.e., recapture), if a horse was never sold, either because it died, or was given away or for other reasons, the Stullers would never pay such tax. At least two of LSA's horses on which they spent substantial sums died before they could be sold.

However, the Plaintiffs state LSA endured unforeseen and fortuitous circumstances between 2003 and 2005 which adversely affected their horse breeding business. Ms. Stuller's spouse and business partner, Hal Stuller, died from a devastating fire which destroyed their home. The fire resulted in the hospitalization of Ms. Stuller. Moreover, the Plaintiffs' business records were partially destroyed and had to be placed in storage after the fire.

The Defendants' expert report did not reference the continued illness of Ms. Stuller following the fire or the demands placed upon her due to

problems with her granddaughter, Shawntee Stuller.  Ms. Stuller testified regarding her teenaged granddaughter's behavior problems.

The Plaintiffs note that Defendant's expert did not mention the business problems that Plaintiffs faced with the corporate Steak 'n Shake entity and the management of the franchises during 2003-2005.  All of this detracted from the time and effort that Plaintiff could devote to her horse breeding operation.  Eventually, the Plaintiffs decided to shut down the horse breeding business and ceased operating as LSA in 2010.

The Plaintiffs further state that their horse breeding operation, like the business in general, faced depressed market conditions in 2003, 2004 and 2005.  Although the Defendant's expert witness conceded that the Tennessee Walking Horse and Breeders Association statistical data showed a decline in the horse business from 2003-2005, his expert witness report did not reference this decline as a factor for consideration in his review of the Plaintiffs' history of income.

However, other evidence appears to suggest that LSA's losses from 2003 to 2005 should not be attributed to a poor economy.  LSA had been

losing money consistently since the mid-1990s, well before any economic downturn. In fact, LSA's income from 2003 to 2005 was higher on average than its income from 1999 to 2002. Moreover, its annual cash loss was higher from 1999 to 2002 than from 2003 to 2005. Accordingly, even if there were economic factors and adverse publicity which affected the Tennessee Walking Horse industry, LSA's financial numbers do not suggest those reasons explain its losses.

The Defendant notes there is no evidence the Plaintiffs made significant efforts to sell or gift the horses. They apparently did not frequent horse sales to sell the animals. The Stullers occasionally gave away horses if they believed the receiver would provide a good home and care for the horse. This was a good practice if the horse could not be sold because it saved money on food and maintenance.

There is no evidence that the Horse Protection Act, which was passed in 1970, contributed to LSA's financial status. Mr. Motes and Mr. Hipsley agreed that soring had a negative impact on the horse industry. Soring is a process by which a Tennessee Walking Horse would receive a chemical or

substance which would alter or enhance its gait, so that it would "prance" during horse shows. Mr. Hipsley testified that, if LSA believed it was experiencing negative publicity affecting its financial results and wanted to make a profit, it could promote its horses to counter the effects of poor publicity by stating, for example, that customers could rely on its horses because they were not sored. There is no evidence the Stullers made such efforts.

(2)

The start-up phase of a horse-breeding operation can last five to ten years. See Engdahl v. Commissioner, 72 T.C. 659, 669 (1979). A taxpayer need not realize an immediate profit in order to have a profit motive. Nickerson v. Commissioner, 700 F.2d 402, 406 (7th Cir. 1983). However, "a record of substantial losses over many years and the unlikelihood of achieving a profitable operation are important factors bearing on the taxpayer's true intention." See Golanty v. Commissioner, 72 T.C. 411, 426 (1979). A history of significant losses does not prevent a taxpayer from establishing a profit motive if other factors suggest that the taxpayer had a

profit motive. See Snyder v. Commissioner, 54 T.C.M. 953 (1987). However, the goal must be to recognize a profit on the entire operation, to the extent that the losses in the earlier years are recouped. See Golanty, 72 T.C. at 427.

The Plaintiffs claim the horse breeding operation suffered from unforeseen conditions (i.e. depressed market, death of husband, personal illness, other business and personal responsibilities) beyond her control, which contributed to the losses suffered in 2003-2005. Therefore, the Plaintiffs claim the factor does not show there was a lack of intent to earn a profit in her horse breeding activity during the years at issue.

However, the Plaintiffs do not explain how these unforeseen conditions contributed to their losses in 2003, 2004 and 2005. In January of 2003, the fire occurred which resulted in Mr. Stuller's death and Ms. Stuller's extended illness. Between 1999 and 2005, despite the depressed economic conditions, LSA's income ($37,500.00) was highest in 2003 while its annual cash loss ($67,104.00) was at its lowest over that seven-year period. LSA's losses in 2004 and 2005 were also less than the loss amounts

between 1999 and 2002. Accordingly, there is no obvious connection between those unforeseen conditions and the Plaintiffs' horse-breeding operation.

The Plaintiffs' argument would be more persuasive if LSA's losses between 2003 and 2005 increased (or if it went from a profitable enterprise to an unprofitable one). Based on the record, however, the Court is unable to determine that the losses can be attributed to unforeseen circumstances. Except for one year, LSA lost substantial amounts of money every year from 1994 to 2009. These losses went beyond the typical time-frame of a start-up phase for a horse-breeding operation.

The Court is unable to conclude that LSA's significant losses over a number of years can be explained by a bad economy or unforeseen circumstances which adversely affected its horse breeding business. Accordingly, this factor favors the Defendant.

## VII. Amount of occasional profits, if any, which are earned

### (1)

The seventh factor to consider is the amount of occasional profits, if

any, which are earned by the taxpayer.  The regulation states:

> The amount of profits in relation to the amount of losses incurred, and in relation to the amount of the taxpayer's investment and the value of the assets used in the activity, may provide useful criteria in determining the taxpayer's intent.  An occasional small profit from an activity generating large losses, or from an activity in which the taxpayer has made a large investment, would not generally be determinative that the activity is engaged in for profit.  However, substantial profit, though only occasional, would generally be indicative that an activity is engaged in for profit, where the investment or losses are comparatively small.  Moreover, an opportunity to earn a substantial ultimate profit in a highly speculative venture is ordinarily sufficient to indicate that the activity is engaged in for profit even though losses or only occasional small profits are actually generated.

26 C.F.R. § 1.183-2(b)(7).  The Plaintiffs note that LSA received a sum of $100,000.00 for the sale of one horse in 1997.  Moreover, a larger sum could be expected for a prize horse.  Thus, the sale of a single horse could have generated a profit during the tax years at issue.  Mack Motes testified that one horse can turn around a horse breeding enterprise and make it profitable.  The Plaintiffs assert that LSA's losses during the tax years at issue are comparatively small when compared to the potential for gain.  Although the horse breeding business is highly speculative, it can lead to

significant profits.

The Defendant states that LSA continued to operate past the point which would ordinarily be necessary to turn the operation into a profitable enterprise and beyond the point in which it could realistically hope to earn income to offset its losses. Mr. Hipsley testified, "[I]t is highly questionable . . . why [LSA] would want to stay in business with those types of losses on an annual basis."

LSA's only profitable year was 1997. The profit was small when compared to the losses in other years. It would have been difficult for LSA to repeat its performance of 1997 due, at least in part, to its business model. Because most of LSA's horses were half-owned by Mr. Motes, even if LSA had a high-value horse, he would receive half of the proceeds from any sale. Because of LSA's business model, it would take that many more valuable horses in order to achieve a profit. LSA did not earn a profit after 1997.

It is unlikely that the Stullers could have had a good faith belief they could sell enough high-value horses to turn a profit. Attempts to breed a

high-value horse result in higher expenses for the horse farm. More horses would have to be bred, which requires caring for more horses. Ms. Stuller testified they once sold a horse for $100,000, after paying approximately $25,000 for the horse. During the years in question, LSA's horses were selling for significantly less than that amount. In 2003, three horses were sold for a total of $35,000, which is an average of $11,666.67 per horse. In 2004, LSA sold five horses for $15,000, an average of $3,000 per horse. In 2005, LSA sold five horses for $23,500, an average of $4,700.00 per horse.

Ms. Stuller testified LSA could earn money in stud fees if it had a grand champion horse. However, LSA did not have such a horse. LSA made some money in stud fees in 2003, but earned no such income in 2004 and 2005.

Mr. Motes testified that attempting to raise a champion horse is a risky and time consuming venture. He testified that many people, including himself, enjoy the challenge of breeding a champion horse. Mr. Motes described the challenge as "addicting."

From 2003 to 2009, LSA's expenses averaged approximately $150,000 per year. Accordingly, LSA would have to sell three $100,000 horses per year to break even, since Mr. Motes would receive half of the proceeds.

Mr. Motes testified regarding the risk and luck, in addition to years of work, which is needed to breed and train a horse to become a champion. Given these factors, the Defendant claims Ms. Stuller could not legitimately have had a good faith belief that LSA would sell three $100,000 horses per year. Mr. Motes was training no more than eight horses of LSA at any one time. Ms. Stuller testified a show horse cannot be sold as a show horse unless it is in training. The horses that were sold by LSA between 2003 and 2005 sold for far less than $100,000.

(2)

The Court concludes that the seventh factor favors the Defendant. Over the years, the amount of losses have far exceeded LSA's only profitable year. The regulation provides that an occasional small profit in the face of large losses and in which the taxpayer has made a large

investment would not generally show that the activity is engaged in for profit. See 26 C.F.R. § 1.183-2(b)(7). Although the Plaintiffs emphasize the testimony that a single horse can sell for tens of thousands of dollars and a prize horse hundreds of thousands of dollars, that statement could be used to support the assertion that almost every horse-breeding operation is operated for profit. If it only takes one horse to turn things around, then virtually any and all horse farms could be said to be one prize horse away from a profitable enterprise. However, the Court must consider the objective factors and not what might be described as a "long-shot" that a breeder will ever acquire a champion horse that could turn a financially-struggling operation around.

Except for the single $100,000 horse sold by the Plaintiffs, there is no evidence LSA had any horses approaching the value of a prize horse. Although the Plaintiffs claim that the actual losses were comparatively small, the losses were consistent and significant.

In Borsody v. Commissioner, TCM 1993-534 (1993), the Tax Court considered a horse farm which had incurred losses of $571,068 over the

course of twelve years. See id. at *3. As in this case, the farm had a modest profit one year–which was due to the sale of one horse for $175,000. See id. The court concluded, "The farm's record of losses over the 12 years for which we have data (losses of $571,068) is persuasive evidence that the petitioners did not, during the years in question, expect to make a profit from the farm . . . and we so find." Id.

While it is true that horse breeding is highly speculative and can result in substantial profits, the Plaintiffs did not realize even occasional substantial profits. One year, LSA received a modest profit which did not come close to offsetting its losses every other year. In such circumstances, the potential for a highly speculative profit is not enough to outweigh the significant losses over a lengthy period. See Giles v. Commissioner, TCM 2006-15, at *16-17, (2006); Rodriguez v. Commissioner, TCM 2013-221, at *17 (2013) (determining that taxpayer did not have a good faith expectation of profit in hoping to sell 29 horses in a single year at about $7,750 per horse, when taxpayer had never received more than $6,500 from selling a horse and had never sold more than three horses in a given year).

Like the Tax Court in Borsody, this Court does not believe that Plaintiffs could have had a good faith belief that LSA ultimately had an opportunity to earn a substantial profit. Given LSA's business structure, a single $100,000 horse every year would not have been enough to realize a profit. Mr. Motes would receive half the sale price. Based on the expenses of the operation, it would take three $100,000 horses in order for LSA to realize a profit. Because there is no evidence LSA ever bred a horse which came close to selling for $100,000, it is highly unlikely it could breed multiple horses in a given year to sell for that amount or higher.

Accordingly, the seventh factor favors the Defendant.

VIII. Financial status of taxpayer

(1)

The eighth factor is the financial status of the taxpayer. The regulation provides:

> The fact that the taxpayer does not have substantial income or capital from sources other than the activity may indicate that an activity is engaged in for profit. Substantial income from sources other than the activity (particularly if the losses from the activity generate substantial tax benefits) may indicate that the activity is not engaged in for profit especially

58

if there are personal or recreational elements involved.

26 C.F.R. § 1.183-2(b)(8).  The Stullers received considerable income from their Steak 'n Shake business.  They also received income from investments in rental property and from other investments.  The Stullers made $7.7 million from sources other than LSA during the years 1999 to 2009.  If allowed to stand, therefore, LSA's losses would generate substantial tax benefits for the Plaintiffs.

The Plaintiffs note no evidence was presented regarding their expenses or cash flow during the years 2003-2005.  Ms. Stuller testified she had cash flow problems with her businesses.  Trust and Bank employee Todd Howe confirmed that Plaintiffs had two mortgages on their real properties and had to refinance their property mortgage in 2008 to obtain sufficient funds to pay the Internal Revenue Service for the taxes at issue in this case.  This payment was necessary to subsequently file a claim for refund and seek review in this proceeding.  The Plaintiffs claim that a bank loan would not have been necessary if they had substantial amounts of cash.

(2)

The eighth factor favors the Defendant. The Stullers received considerable income from their other activities, which included ownership of five Steak 'n Shake franchises, rental properties and investment income. The losses from the horse breeding activities would, if allowed to stand, generate substantial tax benefits. Moreover, Ms. Stuller testified regarding the personal and recreational elements involved with a horse farm.

Although the Plaintiffs emphasize their expenses and cash flow problems, the regulation is silent as to those issues. This may be because a taxpayer with substantial income from other sources can afford to engage in an activity that might result in significant losses. "[W]e compare the income generated by an activity with the taxpayer's taxable income from sources other than the activity and query whether the taxpayer's ability to earn income elsewhere allows her to finance an otherwise unprofitable activity from which she derives some personal or tax benefits." Rodriguez, TCM 2013-221, 2013 WL 5272771, at *20.

As has been discussed, the income generated by LSA was not significant. The Stullers' income from other sources was substantial. If the

Stullers did not have other sources of income, it would seem unlikely they could continue their horse breeding activities given the annual cash loss amounts. There is no question that the Stullers' ability to earn income from other sources allowed them to finance an otherwise unprofitable activity. This unprofitable enterprise had strong personal elements and potential tax benefits.

Accordingly, the eighth factor strongly favors the Defendant.

IX. Elements of personal pleasure or recreation

(1)

The ninth factor involves a consideration of whether the taxpayer derived personal pleasure or recreation. It provides as follows:

> The presence of personal motives in carrying on of an activity may indicate that the activity is not engaged in for profit, especially where there are recreational or personal elements involved. On the other hand, a profit motivation may be indicated where an activity lacks any appeal other than profit. It is not, however, necessary that an activity be engaged in with the exclusive intention of deriving a profit or with the intention of maximizing profits. For example, the availability of other investments which would yield a higher return, or which would be more likely to be profitable, is not evidence that an activity is not engaged in for profit. An activity will not be treated as not engaged in for profit merely because the taxpayer

has purposes or motivations other than solely to make a profit. Also, the fact that the taxpayer derives personal pleasure from engaging in the activity is not sufficient to cause the activity to be classified as not engaged in for profit if the activity is in fact engaged in for profit as evidenced by other factors whether or not listed in this paragraph.

26 C.F.R. § 1.183-2(b)(9). Ms. Stuller testified that although she always kept two or three horses for personal pleasure, those horses were always for sale. However, the other horses on the horse farm were there for business purposes. Ms. Stuller testified that the horse-breeding enterprise requires long hours and hard work. She further testified that the horse farm was a working farm with barbed wire fences, not a horse farm with wooden fences and numerous employees.

Ms. Stuller acknowledges her love of horses. However, a horse breeding operation with 30 or 40 horses requires significant amounts of time and attention. The Plaintiffs state that based on the number of horses at the farm and the amount of work associated with caring for them, there would be little time to enjoy her favorite horses or horse activities.

(2)

The ninth factor, standing alone, is not particularly probative. It is

undisputed that Ms. Stuller enjoys horses.  The first sentence of the regulation suggests that when this is the case, then it might follow that the activity is not being engaged in for profit.  However, the rest of the regulation cautions against drawing such an inference.

The second sentence of the regulation does not really apply to this case.  The next few sentences recognize that a taxpayer can have more than one motive in engaging in an activity.  She can have a profit motive while still enjoying the activity.  It should not be assumed that the taxpayer is not engaged in an activity for profit simply because she enjoys the activity.  Based on the foregoing, the Court declines to infer that the horse breeding operation is not engaged in for profit simply because Ms. Stuller enjoys horses.

The final sentence of the regulation provides that a taxpayer's enjoyment of an activity is not enough to result in a finding that the taxpayer is not engaged in for profit if the other factors tend to show that the activity is engaged in for profit.  Because the other factors considered thus far do not suggest that the activity is engaged in for profit, the final

sentence is not particularly probative.

Although Ms. Stuller loves horses, a horse farm such as LSA requires a significant amount of time, attention and hard work. Upon reviewing the facts, the ninth factor does not strongly favor either party.

X. Other factors

The Plaintiffs assert the Court should also consider the credibility of Ms. Stuller and the other witnesses on the Plaintiffs' behalf. Because this case was tried at bench, one of the Court's roles is to assess the credibility of witnesses. To the extent that Plaintiffs are suggesting the Court should consider Ms. Stuller's (or any other witness's) character for truthfulness, however, such evidence is generally inadmissible. See Fed. R. Evid. 608(a).

Additionally, the Court must give greater weight to the objective facts than to the taxpayer's mere statement of her intent. See 26 C.F.R. § 1.183-2(a). Therefore, the Court must give greater weight to the previously discussed objective factors than to any assertions about the credibility of witnesses.

The Defendant claims that the Stullers' contention that LSA's

ownership of thirty to forty horses is evidence that LSA was operated with the intent to earn a profit should be rejected. Some of the Plaintiffs' witnesses testified that any horse farm which included 30 or 40 horses would be operated for profit. Mr. Hipsley testified that the number of horses owned is not relevant as to whether the horse business is operated for profit.

Except for the aforementioned testimony, neither party has cited any authority for the assertion that the number of horses on the Stuller farm is indicative of a profit motive or lack thereof. At first glance, it might seem odd for a horse farm to include 30 or 40 horses unless the operators were seeking to profit. For those who enjoy horses, however, it might not be at all strange to own that many horses. Moreover, an argument might be made that having fewer horses would be better evidence of a profit motive, given the costs and expenses that likely would be saved.

Accordingly, the Court does not find the number of horses owned by the Stullers to be particularly probative.

<u>Shifting of burden of proof and preponderance of evidence</u>

As earlier noted, the Defendant alleges the Court should not have allowed the Plaintiffs' motion to shift the burden of proof to the Defendant upon presenting their testimony and evidence.

The applicable statute provides that although the taxpayer bears the initial burden of proving entitlement to a claimed deduction by a preponderance of the evidence, the burden shifts to the Commissioner to disprove the entitlement if the taxpayer produces "credible evidence" with respect to the tax liability. See 26 U.S.C. § 7491. Courts have held that this shifting of the burden of proof is significant only in cases of an evidentiary tie. See Trout Ranch, LLC v. Commissioner, 493 F. App'x 944, 955 (10th Cir. 2012); Keating, 544 F.3d at 906; Geiger v. Commissioner, 279 F. App'x 834, 835 (11th Cir. 2008). This is because if both parties have met their burdens of production by presenting some evidence, then the party supported by the weight of the evidence will prevail regardless of which party bore the initial burden of production or persuasion. See Blodgett v. Commissioner, 394 F.3d 1030, 1039 (8th Cir. 2005).

Because this case did not result in an evidentiary tie, the Court need

66

not address the Defendant's argument.

For the reasons stated herein, the Court concludes most of the factors listed in 26 C.F.R. § 1.183-2(b) favor the Defendant. Upon considering each factor, the Court determined that six of the nine factors favor the Defendant, while two are neutral and one favors the Plaintiff. The Court does not find any other factors to be particularly probative.

In addition to finding that most of the factors favor the Defendant, the Court further concludes that the most significant factors support the Defendant's position that LSA was not operated with the predominant intent to make a profit. The first factor–the manner in which the taxpayer carries on the activity–is an important factor. Despite consistent losses, the Plaintiffs did not substantively alter their methods, adopt new techniques or cease operations, which suggests they were not engaged in the activity for profit.

The sixth and seventh factors, respectively, the Plaintiffs' history of losses with respect to the activity that went beyond LSA's initial stage and the amount of profits in relation to the amount of losses incurred, are

particularly significant in considering a taxpayer's true intention. See Golanty, 72 T.C. at 426. Those factors also suggest the Plaintiffs were not engaged in the activity for profit.

The Court also finds that the financial status of the taxpayer is significant. The fact that the Stullers received substantial income from Steak 'n Shake and other sources suggests that the activity was not engaged in for profit. This is particularly true when the personal and recreational elements of a horse farm are considered.

Because the majority of the objective factors–including the most significant factors–favor the Defendant's argument that the Plaintiffs did not engage in the horse-breeding operation for profit, the Court finds by a preponderance of the evidence that Plaintiffs did not have a good faith expectation of profit.

<u>Late Filing Penalty</u>

(A)

The applicable statute provides that a late filing penalty may be assessed if the tax return is filed late unless the tax payer establishes

68

"reasonable cause" for the failure to file it on time. See 26 U.S.C. § 6651(a)(1). The record establishes that after an extension was granted, the Stullers' individual tax return for 2003 was due on October 15, 2004. It was not filed until February 20, 2005, which was approximately four months late. The Plaintiffs paid a failure to file penalty and failure to pay penalty on August 27, 2009.

The Plaintiffs claim there were a number of extenuating factors which caused the delay in filing the 2003 income tax return. The devastating fire at the Stullers' home in January 2003 caused the loss of tax records and required the storage of tax records in unmarked boxes at Evans Restoration facility. Moreover, the fire resulted in the death of Hal Stuller on January 8, 2003, and the hospitalization of Wilma Stuller. Ms. Stuller testified that following the fire, she experienced stress and depression and suffered from other illnesses such as chronic bronchitis. Ms. Stuller stated she was very disorganized and unable to open the mail on certain days.

Ms. Stuller testified the records needed by her accountant to prepare the tax returns consisted primarily of bank statements. Although she

sometimes requested additional copies of statements from the bank, Ms. Stuller testified she did not recall whether she requested duplicate copies so that her 2003 tax returns could be prepared on time. The records that had been boxed up were a "mess." Eventually, Denise Sherwood and Mary Bruno, the office manager at Stuller, Inc., helped Ms. Stuller find the necessary records to prepare the 2003 return. Although Ms. Stuller placed Ms. Sherwood in charge of the records beginning in 2003, Ms. Sherwood was not available to oversee the records that were brought to the new home in early 2004 because she was on vacation at that time.

Following Mr. Stuller's death, there were additional health and behavioral problems with the Stullers' granddaughter. The Stullers had legal custody of and cared for Shawntee Stuller. After Mr. Stuller's death, Shawntee required additional care and attention from Ms. Stuller.

The Plaintiffs further note that the death of Mr. Stuller and the existence of his Trust dated January 14, 1993 also required the allocation of the decedent's trust principal to a Family Trust for the federal exemption amount. The trust document also provided that any remaining assets

would be distributed to the Marital Deduction Trust. Therefore, the Successor Trustee, Wilma Stuller, had to identify and transfer assets in Mr. Stuller's Trust to the Family Trust and Marital Deduction Trust. These transfers resulted in additional work for the accountants and attorneys and further delay. Mr. Stuller's death also required income tax returns for the Estate of Hal Stuller, the Family Trust and Marital Deduction Trust for the taxable year 2003.

Ms. Stuller further explained the delay by testifying there was confusion regarding the assets that were tied to Mr. Stuller's Trust, his estate and the estate of Mr. Stuller's mother. Ms. Stuller knew she was required to file a tax return for 2003 and was aware of the applicable due date. Moreover, Ms. Stuller was aware she could file a return and later amend that return, if necessary.

Ms. Stuller attributed the late filing of the return primarily to being "disorganized" at the time, which she stated was due in large part to personal difficulties. These difficulties included grieving for her husband following his death on January 8, 2003, raising her granddaughter and

dealing with problems at Stuller, Inc., all of which the Plaintiffs claim contributed to the late filing.

Additionally, the Plaintiffs note that Defendant conceded prior to trial that there was reasonable cause for the Plaintiffs to pay their 2003 tax liability in an untimely manner. The Pretrial Order provides, "The United State agrees that Plaintiffs are entitled to a refund of the late payment penalty assessed against them in the amount of $16,454.69 pursuant to 26 U.S.C. § 6651(a)(2) for the tax year 2003, plus statutory interest."

The Defendant asserts none of the alleged reasons explain the Plaintiffs' late filing. Ms. Stuller's explanation does not account for how she was able to file her 2002 tax return on time in October 2003, the same year as the tragic events. Moreover, the Defendant notes Ms. Stuller was able to perform many other professional and recreational activities during 2003. In addition to other horse shows, Ms. Stuller competed in Celebration in 2003 and 2004, which required that she be engaged in somewhat intense training. During that time frame, Ms. Stuller also spent a significant amount of time and energy building her home. Ms. Stuller

spent additional time settling her late husband's estate.

The Defendant further notes Ms. Stuller actively ran the Steak 'n Shake businesses during 2003. She fired the old director of operations and hired Hartzel Bruno in that capacity in 2003. Mr. Bruno, a long-time friend of the Stullers, testified Ms. Stuller's health did not negatively affect the performance of the Steak 'n Shake franchises in 2003 and that Ms. Stuller was attentive to the necessary issues of the businesses during that time. He further testified that Ms. Stuller addressed any problems in a timely manner and he was always able to contact her for business-related matters when it was necessary during 2003.

(B)

The Government bears the burden of production regarding the propriety of the late-filing penalty imposed on the Stullers pursuant to 26 U.S.C. § 6651(a)(1). See 26 U.S.C. § 7491(c). If there is no dispute that the taxpayer has filed a late tax return, however, the Government has met its burden of production under § 7491(c). See Higbee v. Commissioner, 116 T.C. 438, 447 (2001 ) (concluding the parties' stipulation that the tax

73

return was filed late satisfied the government's burden of production). Because there is no dispute that the Stullers filed their 2003 income tax return approximately four months late, the Defendant has met its burden of production with respect to the late filing penalty imposed on the Stullers.

Section 7491 does not shift the burden of proof to the Government with respect to penalties. See Royster v. Commissioner, 99 T.C.M. (CCH) 1077, 2010 WL 342855 (T.C. 2010). "Pursuant to section 7491(c), the Commissioner generally bears the burden of production for any penalty, but the taxpayer bears the ultimate burden of proof." Id. at *4. In connection with a late-filing penalty under § 6651, therefore, the Government "does not bear the burden of proof with regard to the 'reasonable cause' exception of section 6651(a)." Higbee, 116 T.C. at 447. Accordingly, the Plaintiffs have the burden of proof as to whether they had reasonable cause for filing their 2003 income tax return late.

If a taxpayer fails to file an income tax return by the date such return is due to be filed, the taxpayer shall be assessed a penalty "unless it is shown that such failure is due to reasonable cause and not due to willful

neglect." 26 U.S.C. § 6651(a)(1). The term "willful neglect" may be interpreted as a "conscious, intentional failure or reckless indifference." United States v. Boyle, 469 U.S. 241, 245 (1985). A taxpayer may show "reasonable cause" by demonstrating that despite exercising "ordinary business care and prudence," she was "unable to file the return within the prescribed time." Id. at 246 (citations omitted).

A fire, casualty, natural disaster or other disturbance can be grounds for relief from a tax penalty. See IRM 20.1.1.3.2.2.2 (11-25-2011). Additionally, death or serious illness of a taxpayer's family member may constitute reasonable cause for late filing, payment or deposit. See IRM 20.1.1.3.2.2.1(3) (11-25-2011). The Plaintiffs claim this case does not involve willful neglect, intentional failure or reckless indifference to timely filing a tax return or paying the amount due for such returns. Accordingly, they contend no late filing penalty should be assessed in this case.

The Court certainly recognizes that 2003 was a tragic year for Ms. Stuller. Mr. Stuller died following the January 6, 2003 fire. Ms. Stuller's home was rendered uninhabitable and she developed pneumonia and was

hospitalized for several weeks.  She testified she also experienced stress and depression following the fire.

However, the Court is unable to determine the Plaintiffs have met their burden of proof that the failure to file the tax return by October 15, 2014 was due to reasonable cause.  Although the Plaintiffs do not specify the records which could not be located, Ms. Stuller testified that bank statements were the primary records her accountant required in order to prepare the tax returns.  The Court presumes that duplicate bank statements could have been requested and obtained if those were necessary to complete the tax return.

Mr. Perrino testified that Ms. Stuller would also provide him with her handwritten notes relating to LSA's income or expenses.  Presumably, those were the records that Ms. Stuller testified were maintained in a box by Ms. Sherwood.  Once again, the Plaintiffs do not say whether these records were missing and/or whether they were needed in order to prepare the 2003 tax returns.

It is also unclear exactly when Ms. Sherwood and Ms. Bruno helped

Ms. Stuller find the records.  Ms. Stuller could not answer whether the records were found within a few weeks of when they began searching for them.  It is not apparent from the testimony whether they began searching for records after the tax return was due on October 15, 2004.  If the search began after October 15, 2004, then the Court would be unable to find that the failure to file was due to reasonable cause.  In addition to running her restaurant business and engaging in other activities, Ms. Stuller competed in Celebration and a number of other horse shows in 2003 and 2004.  Because Ms. Stuller was able to engage in such activities prior to October of 2004, the Court has no basis to conclude that she could not produce the necessary records in order to file the tax return by October 15, 2004.

If on the other hand there was evidence that they searched futilely for the records over a period of weeks or months before the tax deadline, then the Plaintiffs might be able to meet their burden when such evidence is considered in conjunction with the other circumstances, such as the fire and Mr. Stuller's death.  However, those tragic occurrences do not alone excuse the late filing.  The Plaintiffs do not say when Ms. Stuller or others on her

behalf began searching for the materials to present to her accountant.

Because there is no evidence that the fire, Mr. Stuller's death or other circumstances contributed to the untimely income tax filing, the Plaintiffs have not met their burden under § 7491(c) of showing reasonable cause for the late filing.

## CONCLUSION

For the reasons stated herein, upon considering the objective factors listed in 26 C.F.R. § 1.183-2(b), the Court concludes that L.S.A., Inc. was not operated with a good faith intent to make a profit. Therefore, the losses are not deductible as business expenses.

The Court further finds that Plaintiffs have not established "reasonable cause" for the late filing of their 2003 return. Accordingly, the Plaintiffs are liable for the penalties associated therewith.

Ergo, the Clerk will enter Judgment in favor of Defendant United States of America.

Pursuant to the Parties' Stipulation as reflected in the Final Pretrial Order, the Plaintiffs are entitled to a refund of the late payment penalty

assessed against them in the amount of $16,454.69, pursuant to 26 U.S.C.

§ 6651(a)(2) for the tax year 2003, plus statutory interest.

ENTER: July 22, 2014

FOR THE COURT:

_____s/Richard Mills_____
Richard Mills
United States District Judge